Rachael D. Lamkin (246066)
Lamkin IP Defense
100 Pine St., Suite 1250
San Francisco, CA 94111
916.747.6091
RDL@LamkinIPDefense.com
*Attorney for Defendant*
*Nuance Communications, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Eloqui Voice Systems, LLC, | Case No.  2:17-cv-00890-JAK-SS |
| Plaintiff, | **DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | |
| Nuance Communications, Inc., a Massachusetts corporation, | Hearing: 11/6/17 8:30 am Rm 10B |
| Defendant. | |

# DEFENDANT'S OPENING

# CLAIM CONSTRUCTION BRIF

Defendant Nuance Communications, Inc. ("Nuance") herein respectfully submits its Opening Claim Construction Brief:

1

**Table Of Authorities**

2  *800 Adept, Inc. v. AT&T Mobility, LLC*, No. 5:07CV23, 2008 U.S. Dist. LEXIS 93179 (E.D. Tex.

3    July 23, 2008) .................................................................................................................. 14

4  *Advanced Aero. Techs., Inc. v. United States*, 124 Fed. Cl. 282 (Fed. Cl. Nov. 24, 2015) ............ 19

5  *AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374 (Fed. Cir. Aug. 19, 2005) ...................... 14

6  *Astrazeneca AB v. Mutual Pharm. Co.,* 384 F.3d 1333 (Fed. Cir. 2004). ................................ 10, 12

7  *Autogiro Co. of Am. v. United States*, 384 F.2d 391 (Ct. Cl. 1967)). ................................................. 9

8  *Aviall Servs. v. Cooper Indus.*, 263 F.3d 134 (5th Cir. Tex. Aug. 14, 2001) ................................ 12

9  *Bell Atl. Network Servs. v. Covad Communs. Group,* 262 F.3d 1258 (Fed. Cir. Aug. 17, 2001).... 15

10  *Broadcom Corp. v. SiRF Tech., Inc.*, No. 08-0546-JVS, 2010 U.S. Dist. LEXIS 144167 (C.D. Cal.

11    Sept. 3, 2010); ................................................................................................................. 14

12  *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328 (Fed. Cir. 2000)). ........................................ 10

13  *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298 (Fed. Cir. 2001). ......................................... 12

14  *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302 (Fed. Cir. 2000) .................. 17

15  *Global Equity Mgmt. (SA) Pty. Ltd. v. Expedia, Inc.,* No. 2:16-cv-00095, 2016 U.S. Dist. LEXIS

16    177218, 2016 WL 7416132 (E.D. Tex. Dec. 22, 2016) ................................................................ 13

17  *Goff v. Harrah's Operating Co.,* No. 3:03-CV-0690-ECR-RAM, 2007 WL 5747096, (D. Nev.

18    Sept. 11, 2007) ................................................................................................................. 13

19  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004)). ...... 8

20  *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533 (Fed. Cir. 1991) ...................................................... 9

21  *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343 (Fed. Cir. Feb. 29, 2016) ............ 11

22  *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350 (Fed. Cir. Mar. 15, 2012). ............. 15

23  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), aff'd, 517 U.S.

24    370 (1996). ...................................................................................................................... 8

25  *MBO Laboratories, Inc. v. Becton, Dickinson & Co.,*474 F.3d 1323 (Fed. Cir. 2007); .................. 13

26  *Nautilus, Inc. v. Biosig Instruments*, 134 S. Ct. 2120 (2014) ........................................................ 18

27  *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ..................................................... 8,9, 10

28  *Poly-America, L.P. v. API Indus., Inc.,* 839 F.3d 1131 (Fed. Cir. Oct. 14, 2016) .................... 11, 18

*Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929 (Fed. Cir. June 3, 2013) ........... 11

*Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243 (Fed. Cir. 1998). ...........................8

*Sinorgchem Co. v. ITC*, 511 F.3d 1132 (Fed. Cir. 2007)..........................................................10, 12

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831 (2015)..................................................8

*Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696 (Fed. Cl. Mar. 19, 2007) .......11

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576  (Fed. Cir. 1996))...........................................9

*Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371

(2003) ....................................................................................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

I.	Background Facts…………………………………………….…………5

II.	Legal Authority…………………………………………………………7

III.	The Personality Term Is Expressly Defined……………………………...10

IV.	Eloqui's Construction Would Invalidate The Asserted Claims…………...15

V.	Eloqui's Construction Would Render Limitations Superfluous
 	& Claims Nonsensical……………………………………………………17

VI.	Eloqui's Construction Would Render The Claims Indefinite……………..17

VII.	Conclusion………………………………………………………………20

## I.    BACKGROUND FACTS

In this matter, Eloqui asserts one claim from each of the three Asserted Patents (6,144,938 Claim 43; 6,334,103 Claim 105; and 7,058,577 Claim 1).  The '938 is the parent patent and the '103 and '577 are continuations, sharing identical specifications.[1]

The Asserted Patents are directed toward a "Voice user interface with personality".   FIG. 1 is a block diagram of a voice user interface with personality in accordance with one embodiment of the invention:



**FIG. 1**

The Asserted Patents were originally filed and held by General Magic, a company whose goal was to create a futuristic handheld PDA communications device (called a personal intelligent communicator).  Two Stanford University professors in the field of human-computer communications, Clifford Nass and Byron Reeves, were hired as consultants by General Magic and charged with creating the "personality" of General Magic's PDA.

Drs. Nass and Reeves had been conducting and publishing computer-to-human

---

[1] Given that the patents share identical specifications, Nuance attached the '938 alone.  *See* Lamkin Decl. Exh. A.

personality research at Stanford's Department of Communication for many years prior to the formation of General Magic. As explained by Drs. Nass and Reeves three years before the priority date of the Asserted Patents, agents with "personality" were "commonplace". In addition, Nass and Reeves believed that attempts to create the personalities for agents were underwhelming because the agent's personalities were not based on the vast psychological research "defining personality . . . for many decades":

> **It has become a commonplace idea that believable agents must have personalities**. Yet, attempts to create personalities of agents virtually never draw on the enormous psychological literature on personality. This is ironic, because **psychologists have been defining personality**, and identifying how particular people will respond to various personality types, for many decades.

("Can computer personalities be human personalities?" Nass, Reeves, et. al. 1995, Lamkin Decl., Exh A; emphasis added.)

Named inventors Nass and Reeves thought using general personalities resulted in less successful products. Conversely, agents employing the two-dimensional personality types as known and studied by psychologists resulted in a better, more accepted, agent:

> **DEFINING PERSONALITY: Psychologists have identified two major interpersonal personality dimensions, the dominance/submissiveness dimension, and the affiliation (warmth/hostility) dimension** [3].
> **. . .**
> Specifically, using a laboratory experiment, we seek to demonstrate that if a computer is endowed with a set of personality markers, **users will be able to identify that personality**, and respond to it **in a manner predicted by personality theory in the field of psychology**.

(*Id.*; emphasis added.)

Based on their belief as to the benefits of designing an agent with a personality as defined in the psychology literature, the named inventors set forth their definition of personality in the Asserted Patents accordingly:

> The term "personality" as used in the context of a voice user interface can be defined as the totality of spoken language characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of human beings in a way that would be recognized by psychologists and social scientists as consistent and relevant to a particular personality type.

('938, 3:24-30; '103, 3:28-33; '577, 3:28-33.)

Dr. Nash and Dr. Reeves' research suggested that pairing agent and human personality types would result in a more successful product. (*See*, Exh. B; '938, 5:10-15, 12:23-26., citations *supra*).  Thus, for the General Magic PDA and the patents covering same, Drs. Nash and Reeves determined that a Person Of Skill In The Art ("POSITA") was a psychologist, and said psychologist should be consulted when designing the system at-issue to make sure the agent had the right personality type for the use-environment:

> In particular, those skilled in the art of, for example, social psychology review the application requirements, and they then determine which personality types best serve the delivery of a voice user interface for the functions or services included in the application requirements.

('938, 5:11-15.)

Based on Drs. Nass and Reeves' research and the conclusions as to the advantages of employing personality types as drawn from psychological research, (the specification employs the term "social-psychology empirical observations" fifteen times), the Asserted Patents claim a very specific type of "personality," one based on the two-dimensional personality types ***defined by psychologists***.

Unfortunately, General Magic was not able to build a successful product and went bankrupt in 2003, when it sold its patents to Intellectual Ventures.  In 2016, Intellectual Ventures sold the Asserted Patents to Plaintiff Eloqui.

## II.   LEGAL AUTHORITY

Claim construction is the process of determining the meaning and scope of the patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), aff'd, 517 U.S. 370 (1996).  It is a matter for the court. *Teva Pharms.*

*USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 840-41 (2015).

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.*

Claim construction "begins and ends" with the words of the claims. *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id*. In addition to the words of the claim(s) being construed, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id*. (citations omitted). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id*. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id*. at 1314-15. However, "[c]laim differentiation is a guide, not a rigid rule. If a claim will bear only one interpretation, similarity will have to be tolerated." *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533,

1538 (Fed. Cir. 1991) (*quoting Autogiro Co. of Am. v. United States*, 384 F.2d 391, 404 (Ct. Cl. 1967)).

"[C]laims must be construed so as to be consistent with the specification, of which they are a part." *Merck & Co. v. Teva Pharms. USA, Inc*., 347 F.3d 1367, 1371 (Fed. Cir. 2003). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (*quoting Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id*.

Further, when the patentee acts as his own lexicographer, that definition "controls". *Astrazeneca AB v. Mutual Pharm. Co.,* 384 F.3d 1333, 1339 (Fed. Cir. 2004).

The prosecution history is also relevant intrinsic evidence. Although "the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation" and for this reason "often lacks the clarity of the specification," it can nonetheless "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the

claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

## III.   PERSONALITY IS EXPRESSELY DEFINED

The only disputed claim term is the "personality" term, which appears in each of the three asserted claims.   The specifications in the Asserted Patents expressly define that term:

> The term "personality" as used in the context of a voice user interface can be defined as the totality of spoken language characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of human beings in a way that would be recognized by psychologists and social scientists as consistent and relevant to a particular personality type.

('938, 3:24-30; '103, 3:28-33; '577, 3:28-33.)

Further, the patentee used quotation marks around the term "personality".   The use of quotation marks alone is a "strong indication" that the patentee was defining the personality term.   *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) ("The term 'controlled amount' is set off by quotation marks--often a strong indication that what follows is a definition.") (*citing Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000)).

Materially, the definition is immediately preceded by the declaration "this present invention," which is a clear sign that the inventor is intending to limit his invention to what follows.   (*See* '938, 3:23-25, "The present invention provides a voice user interface with personality. The term 'personality' as used in the context of a voice user interface can be defined as . . ."); *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. June 3, 2013) (When a patentee "describes the features of "the present invention" he implicitly alerts the reader that this description limits the scope of the invention.); *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. Feb. 29, 2016) (accord); *Poly-America, L.P. v. API Indus., Inc.,* 839 F.3d 1131, 1136 (Fed. Cir. Oct. 14, 2016) (accord).   The patentees, under well-settled law, told the public they were limiting the invention to

an express definition, and they must be held to that definition.

Further, the definition is immediately followed by examples: "For example, personality types include the following: friendly-dominant, friendly-submissive, unfriendly-dominant, and unfriendly-submissive." ('938, 3:30-33.)   Under the principles of *ejusdem generis* and *noscitur a sociis* personality types must fall within the category of the examples provided*, i.e.,* personality types "that would be recognized by psychologists and social scientists as consistent and relevant to a particular personality type." *See Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 724 (Fed. Cl. Mar. 19, 2007) ("the canon of construction, 'ejusdem generis,' creates a presumption that the enumeration or qualification of an enumeration of terms in a sentence or provision should be construed as being of the same classification or category."); *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384, (2003) ("[U]nder the established interpretative canons of *noscitur a sociis* and *ejusdem generis*, where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."); *see also Markman*, 52 F.3d at 987 (the principles of statutory construction, are an "appropriate analogy for interpreting patent claims.").

The use of the word "defined," the employment of "this present invention" and quotation marks, and the placing of examples immediately following the definition each independently affirm that the patentee was acting as his own lexicographer. Because the patentee acted as his own lexicographer, that definition "controls".   Full stop. *Astrazeneca AB v. Mutual Pharm. Co.,* 384 F.3d 1333, 1339 (Fed. Cir. 2004). The rule is so well-established as to be axiomatic.[2]   "The patentee must be bound by

_____

[2] *See, e.g., Phillips v. AWH Corp*., 415 F.3d 1303, 1321 (Fed. Cir. 2005) (*en banc*); *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp*., 493 F.3d 1358, 1361 (Fed.

the express definition." *Sinorgchem Co. v. ITC,* 511 F.3d 1132, 1136 (Fed. Cir. 2007) (*citing Durel Corp. v. Osram Sylvania Inc*., 256 F.3d 1298, 1303-04 (Fed. Cir. 2001).

In an effort to overcome the above-cited intrinsic evidence, Eloqui argues, without citation to authority, that the use of the word "can" in the phrase "can be defined as" means that the definition is permissive and that "personality" might be defined as set forth in the patents, or it might not.  But claims terms are understood in the context of the specification; Eloqui cannot just cite a single word and hang its entire construction on that extracted word.  Further, "can" is not by definition merely a permissive term; again, context matters. *See Aviall Servs. v. Cooper Indus*., 263 F.3d 134, 138-39 (5th Cir. Tex. Aug. 14, 2001) ("Aviall's analysis is inconsistent with our canons of statutory construction.  Depending on the context, the word 'may' can have the permissive definition of 'have liberty to,' or alternatively, it can denote exclusivity as in 'shall [or] must.'") (*citing* WEBSTER THIRD NEW INTERNATIONAL DICTIONARY 1396 (3d ed. 1993)).[3]

The substantial intrinsic record in favor of Nuance's position aside, Nuance only found one case citing the phrase "can be defined as" in the context of claim construction.  In that case, far from doubting that the phrase signaled a definition, the judge considered the definition "pithy" (*i.e.,* concise or forcefully expressive), and relied upon it. *See Global Equity Mgmt. (SA) Pty. Ltd. v. Expedia, Inc.,* No. 2:16-cv-00095, 2016 U.S. Dist. LEXIS 177218, at *84-86, 2016 WL 7416132 (E.D. Tex. Dec. 22, 2016) ("the '183 Patent provides a pithy explanation of what 'partition' means: . . . Generically, a partition can be defined as a continuous segment of storage.").  The *Global Equity* court then concludes: "Thus, a 'partition' is a continuous segment of secondary storage"; *i.e.,* is the definition following "can be defined as". *Id*.

---

Cir. 2007); *3M Innovative Props. Co. v. Avery Dennison Corp*., 350 F.3d 1365, 1374 (Fed. Cir. 2003).

[3] https://www.merriam-webster.com/dictionary/can

Eloqui's reliance on "*can* be defined as" in the face of substantial intrinsic evidence confirming the definition of personality is particularly unsupported in law where, post *Phillips*, "it is clear that the manner in which a term can be 'defined' by the specification may be implicit." *Goff v. Harrah's Operating Co.,* No. 3:03-CV-0690-ECR-RAM, 2007 WL 5747096, at *4 (D. Nev. Sept. 11, 2007) (*citing MBO Laboratories, Inc. v. Becton, Dickinson & Co.,* 474 F.3d 1323, 1329 (Fed. Cir. 2007); *SciMed*, 242 F.3d at 1344 ("[T]he written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, **even if the guidance is not provided in explicit definitional format**.") (emphasis added).   Thus, the patentees didn't even need to use the phrase "can be defined as" to set forth a definition.

Further, assuming *arguendo* that the specification hadn't expressly defined the personality term, the specification independently teaches that the personality term should be construed consistently with the definition at '938, 3:24-30, *to wit*:

> Personality engine 204 controls voice user interface software 202 **to provide a voice user interface with a personality.** For example, personality engine 204 provides **a friendly-dominant personality** that interacts with a user using a dialog of friendly directive statements (e.g., statements that are spoken typically as commands with few or no pauses).

('938, 4:28-33; emphasis added.)

> Personality engine 206 controls voice user interface software 208 **to provide a voice user interface with a personality.** For example, personality engine 206 provides a **friendly-submissive personality** that interacts with a user using a dialog of friendly but submissive statements (e.g., statements that are spoken typically as questions and with additional explanation or pause).

('938, 4:38-45; emphasis added.)

> The scripts are read by the actor as directed by a director in a manner that provides recorded scripts of the actor's voice **reflecting personality consistent with the selected personality**. For example, **a system that includes a voice user interface with personality, which provides a voice**

> **user interface with a friendly-dominant personality** would have the speaker speak more softly and exhibit greater pitch range than if the voice user interface had a friendly-submissive personality.

('938, 6:14-23; emphasis added; *see also* 20:35-41.)

In each instance, the examples state that a personality will be selected, and then each gives an example falling into the category of two-dimensional personality types as defined by psychologists.  These examples strongly suggest that the personality term should be construed consistent with the definition, *supra*.  *See Broadcom Corp. v. SiRF Tech., Inc.*, No. 08-0546-JVS, 2010 U.S. Dist. LEXIS 144167, at *44 (C.D. Cal. Sept. 3, 2010); *AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. Aug. 19, 2005) (finding that the term "fiberfill" referred exclusively to synthetic fiber where all references in specification referred to synthetic fibers, without any discussion regarding the possibility of using natural fibers); *800 Adept, Inc. v. AT&T Mobility, LLC*, No. 5:07CV23, 2008 U.S. Dist. LEXIS 93179, at *68 (E.D. Tex. July 23, 2008) ("It is entirely proper to refer to the examples and statements in the specification . . . to define" a term.) (*citing AquaTex.*)

In fact, the consistent use of the phrase "selected personality" with the immediately-following examples of two-dimensional personality types as defined by psychologists, are enough alone to define the personality term by implication.  *See Bell Atl. Network Servs. v. Covad Communs. Group,* 262 F.3d 1258, 1271-73 (Fed. Cir. Aug. 17, 2001) ("Thus, when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'") (*quoting Vitronics*, 90 F.3d at 1582.)

Most damning to Eloqui's position, however, is that the portion of the specification Eloqui cites for its proposed construction is the actual definition. (Dkt. 52-1.)  Eloqui proposes "personality" be construed as, "characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of a human being."  (*Id*.)  For support, <u>Eloqui cites the exact same citation relied upon by</u>

Nuance, *i.e.*, the definition citation, '938, 3:24-28.  (*Id*.)   Thus, Eloqui has simply clipped off the first portion of the definition ("the totality of spoken language") and the end of the definition ("in a way that would be recognized by psychologists and social scientists as consistent and relevant to a particular personality type"):

> The term "personality" as used in the context of a voice user interface can be defined as the totality of spoken language <u>characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of human beings</u> in a way that would be recognized by psychologists and social scientists as consistent and relevant to a particular personality type.

(Eloqui's proposed construction in underline.)

Both Nuance and Eloqui look to the exact same portion of the specifications in support of their construction; Eloqui simply impermissibly cleaves off the words that don't suit its infringement case.  That is not the purpose of claim construction.

## IV.   ELOQUI'S CONSTRUCTION WOULD INVALIDATE THE ASSERTED CLAIMS

Courts are directed to avoid a construction that would render a claim invalid unless such a construction is *the only* construction possible. *See Marine Polymer Techs., Inc. v. HemCon, Inc*., 672 F.3d 1350, 1368 (Fed. Cir. Mar. 15, 2012).  Here, adopting Eloqui's construction would render the asserted claims invalid.

Eloqui's proposed construction for the personality term is "characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of a human being".  In other words, Eloqui hopes to obtain a construction for personality that essentially means "simulating human verbal behavior" or "human-like".  But in so doing, Eloqui improperly tries to obtain claim scope that existed in the prior art.  And, fatal to Eloqui's position, would render their claims invalid.

For example, as the Examiner made clear, human-like agents were "well-known".  ('938 Prosecution History, 12/9/99 Office Action, Lamkin Decl. Exh. C,

*citing* US Patent No. 5,860,064 (Henton[4]).

Henton covers the same subject matter as the Asserted Patents ("A method and apparatus for the automatic application of vocal emotion parameters to text in a text-to-speech system"), and was filed by Apple Computer a year before the Asserted Patents' priority date.  Relying upon Henton, the Examiner stated that the prior art "teaches one of ordinary skill in the art the benefit of using synthesized with vocal emotions to reproduce speech message **which is emotionally colored and therefore has a human quality**."  (*Id.*)   In other words, Henton anticipates the asserted claims under Eloqui's construction.  It is the precise and specific definition of personality in the specification that is the only aspect of the asserted claims that are even arguably novel.[5]  The Examiner made this clear in his Notice of Allowability for the '103 patent:

> The following is an examiner's statement of reasons for allowance: the prior art taken alone or in combination fail to teach a voice user interface with personality, the personality emulating human verbal behavior for a particular personality as described in the specification, especially page 8, lines 15-22 ['938, 3:24-30].

('103 Prosecution History, 7/17/2001 Notice Of Allowance, Lamkin Decl. Exh. E; emphasis added.)

The "especially" portion cited by the Examiner is the definition as set forth at '938, 3:24-30.  (Lamkin Decl., Exh. F.)

---

[4] The Examiner mistakenly refers to 5,860,064 as "Clynes," but it is Henton. (Lamkin Decl. Exh. G.)

[5] Since Reeves and Nass actually published papers disclosing their agent with personality three years before the '938 was filed, the claims are not in fact novel. But General Magic failed to disclose Dr. Nass and Reeves papers to the USPTO so on the intrinsic record, employing Nass and Reeves specific definition of "personality" allowed the Asserted Patents to issue.

## V.     ELOQUI'S CONSTRUCTION WOULD RENDER LIMITATIONS SUPERFLUOUS & CLAIMS NONSENSICAL

It's a basic tenant of patent law that claims cannot be construed in a manner that would render other limitations superfluous. *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1305-07 (Fed. Cir. 2000) (refusing to adopt a claim construction which would render claim language superfluous). Claim 1 of the '103 Patent requires, *inter alia*, "logic that provides a personality, **the personality emulating human verbal behavior** for a particular personality." ('103, Claim 1.) As Eloqui's construction is, essentially, simulating or emulating human verbal behavior, the adoption of its construction would render the "emulating human verbal behavior" claim limitations superfluous.   That should be avoided.

Equally, adopting Eloqui's construction would render claims nonsensical.  For example, Claim 105 of the '103 patent requires a "plurality of personalities".   A "plurality of personalities" makes sense under the given definition, e.g., the designer of the system could choose between a friendly-submissive or a friendly-dominant agent.  (*See* '938, 4:38-45, 5:11-15, 6:14-23.)   But it makes no sense to choose from a plurality of personalities where the "personality" is "characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of human beings."

## VI.     ELOQUI'S CONSTRUCTION WOULD RENDER THE CLAIMS INDEFINITE

Assuming *arguendo* that this Court permitted Eloqui's improper pluck-and-play construction, said construction would render the Asserted Claims invalid under Section 112(2).  *See Nautilus, Inc. v. Biosig Instruments*, 134 S. Ct. 2120, 2124 (2014) ("[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.") (*citing* 35 U.S.C. § 112 ¶ 2).

A patent claim's boundary "must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus*, at 2123.   Here, as the file histories make clear, an agent with "personality" must be more than an agent that can express human-like emotion.  For example, in trying to circumvent prior art, the patentees expressly stated, "emotion is not personality". ('938 Prosecution History, 4/2/2001 Response to Office Action, Lamkin Decl., Exh D, EVS1671.)   This clear statement is a disavowal of claim scope; the patentees are giving express notice that the "personality" in the Asserted Patents is not the mere expression of emotion" *See Poly-America, L.P. v. API Indus., Inc.,* 839 F.3d 1131, 1136 (Fed. Cir. Oct. 14, 2016) ("an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature.")

Further, in distinguishing prior art, the patentees stated, "emotion is not personality" and then immediately cited the patents' definition of personality.   ('938 Prosecution History, 4/2/2001 Response to Office Action, Lamkin Decl., Exh D, EVS1671.)

Thus, companies are on notice that they can create an agent or avatar with a personality that expresses emotion as "that is not" the personality claimed in the Asserted Patents.   But there is no cognizable boundary between an agent that expresses emotion and one with "characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of a human being".[6]   A company such as Nuance knows it can make an agent with personality as those were "commonplace" even before the Asserted Patents (Exh. A).   Nuance can make an

---

[6] Further, if Eloqui's infringement position is based on the subjective opinion of a psychologist or the like, the asserted claims would be indefinite under either Party's construction.  Given the strength of the intrinsic record as to the "personality" term, Nuance did not move to have the term rendered indefinite as it likely would have wasted resources.

agent that is "human-like".  (Exh. D)  And companies like Nuance can make agents that express emotion.  (Exh. E.)  But companies purportedly cannot create an agent with "characteristics that simulate the collective character, behavioral, temperamental, emotional, and mental traits of a human being".

Eloqui's proposed construction places the various markers of personality on a continuum and asks POSITA to find the barriers.   That is the kind of fuzzy boundary Section112(2) was drafted to prevent.  *See Advanced Aero. Techs., Inc. v. United States*, 124 Fed. Cl. 282, 300 (Fed. Cl. Nov. 24, 2015) ("The specification, however, provides no reference point is for distinguishing an 'inboard' portion from an 'outboard' portion of the wing. Without a reference point, no informed or confident choice of location can be made. For example, if the reference point is the outer edge of the wing tip, every point on the wing could be an 'inboard point.'"); Prolifiq Software Inc. v. Veeva Sys., No. C 13-03644, 2014 U.S. Dist. LEXIS 108630, at *21-22, 2014 WL 3870016 (N.D. Cal. Aug. 6, 2014) ("As explained in the examples given by Veeva at the claim construction hearing, one person could look at a digital image of a dog and a digital image of a cat and reasonably conclude that these images are not "like-topic" and, thus, not "differently versioned" content elements because dogs are different from cats. But, another person could look at the same two images and just as reasonably conclude that the images are "like-topic" because they are both images of pets and, thus, are different versions of pet images. Therefore, the boundaries of the term "differently versioned" in the context of the patents-in-suit will often depend on the unrestrained, subjective opinion of the person practicing the invention, leaving the scope of the claims in a zone of uncertainty."); *Interval Licensing LLC v. AOL, Inc*., 766 F.3d 1364, 1373 (Fed. Cir. 2014).

## VII.   CONCLUSION

Named inventors Nass and Reeves were Stanford professors and researchers in the field of human-computer communications.  They spent years conducting research into which types of agents or avatars would prove to be most successful in interacting with humans.  They came to the conclusion that agents should be designed based upon "decades old" psychological research about two-dimensional personality types.  Accordingly, their patents expressly set forth the personality they thought would be most successful.

The intrinsic record is clear and without contradiction in setting forth the named inventors' definition of "personality".  Later purchasers (or asserters) of the Patents should not be permitted to try to circumvent the public notice function of the patent system by attempting to broaden clearly-defined terms.

Respectfully submitted,


*Rachael D. Lamkin*


Rachael
Rachael Lamkin
*Attorney For Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of September, 2017, a true and accurate copy of the above and foregoing:

**DEFENDANT NUANCE COMMUNICATIONS INC.'S OPENING CLAIM**

**CONSTRUCTION BRIEF**

Was filed with the Court's CM/ECF system, which provides service to all counsel of record.

*Rachael D. Lamkin*

Rachael D. Lamkin